UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------- x
CUMBERLAND FARMS, INC. and
CONOCOPHILLIPS COMPANY,

                    Plaintiffs,          <u>MEMORANDUM AND ORDER</u>

        -against-                        Civil Action No.
                                         CV-04-3991 (DGT)
RIAN REALTY, LTD.

                    Defendant.

------------------------------------------------- x

TRAGER, J.

    This dispute arises from the assignment of a commercial

lease, which the landlord contends was made in violation of the

lease.  A <u>Yellowstone</u> injunction was granted in November 2004;

now, both parties move for summary judgment.


                         **Background**

    Defendant Rian Realty, Inc. ("defendant" or "Rian") is the

owner of real property located at 115-05 Beach Channel Drive, Far

Rockaway, New York 11694 ("Premises").  Def's Appx., Ex. R.

(Deposition of Naftaly Hirshman) ("Hirshman Dep.") at 7-8.[1]  Rian

is owned by Naftaly Hirshman and his wife.  Hirshman Dep. at 6-7.

Rian has owned the Premises since 1976.  <u>Id.</u> at 7.  From 1976

until 1998, there was a Exxon gas station on the Premises.  <u>Id.</u>

_____

        [1]  Unless otherwise noted, letter-designated exhibits refer
to the appendixes submitted by the parties.  Similarly, unless
otherwise noted, exhibits designated by number refer to exhibits
attached to defendant's "Rule 56 Statement."

at 7-8; Affidavit of Matthew Fischer ("Fischer Aff.") ¶ 2; Ex. S;
Ex. U, Article 1(b). Although it is unclear from the record, it
appears that Exxon Corporation ("Exxon") held a lease to the gas
station. Hirshman Dep. at 8-9. On July 16, 1998, Rian and Exxon
duly executed a new written lease ("Lease") affecting the
Premises. Ex. U.[2] The Lease, which became effective on July 21,
1998, has a term of fifteen years, running from January 1, 1999
to December 31, 2013. The parties agreed that the gas station
would be torn down and a new gas station and convenience store
would be constructed. Ex. V. (First Amendment of Lease, dated
Oct. 19, 1999); Ex. S. (Deposition of Adam DiGirolamo)
("DiGirolamo Dep.") at 8; Hirshman Dep. at 14-15, 23. Once the
Lease was signed, the old gas station was dismantled. Id.

On December 19, 1999, Exxon informed Rian that Tosco
Corporation ("Tosco") had agreed to acquire over 1,700 Exxon
service stations. Ex. 2. Exxon sought Rian's consent to an
assignment of the Lease to Tosco. Id. In a letter dated
February 27, 2000, Exxon explained to Rian that Exxon[3] believed
that it was entitled to assign the Lease to Tosco Corporation
("Tosco") and that Rian's consent to the assignment could not be

_____

[2] All citations to "Articles" refer to Articles of the
Lease identified as Ex. U.

[3] Although Exxon had, by this point, become ExxonMobil, for
purposes of simplicity, the corporation will continue to be
referred to as Exxon.

reasonably withheld under the circumstances.[4]  Ex. O.  The letter

also discussed a number of other outstanding issues between Exxon

and Rian.  On March 1, 2000, with written consent from Rian,

---

[4]  Article 27, entitled, "ASSIGNMENT BY LESSEE" states that:

(a) Lessee shall not assign its interest in this
lease or in the [Premises], in whole or in part,
without the prior written consent of Lessor, which
consent shall not be unreasonably withheld. . . .
Lessor's denial of consent to assignment to a
proposed assignee which is not a major oil company
or a company with a net worth of less than
$100,000.00, shall not be deemed unreasonable,
unless Lessee agrees to remain liable.

(b) Provided Lessee is not in default of this lease
(beyond applicable "notice" and  "cure" periods
under Article "30."), Lessee may assign its
interest in this lease as to the entire [Premises]
only, without the consent of Lessor, if the
Assignment is to an entity which is mutually
considered to be a "major" oil company at the time
of assignment.  For purposes of references only,
the following are considered "major oil companies"
at the date of this Lease: EXXON, AMOCO, MOBIL,
SHELL and SUNOCO.  Lessee shall continue to remain
liable to Lessor for all obligations of
"Tenant"/"Lessee" under this lease, unless and
until such "Major oil company" assignee delivers to
Lessor, a full, unconditional, assumption
agreement, whereby it assumes all obligations of
Lessee under the lease.

(c) No assignment shall be effective unless Lessor
is furnished with an Estoppel Certificate and
Assignment and Assumption Agreement (duly
acknowledged), signed by all parties to such
assignment, in form reasonably acceptable to
Lessor, prior to the effective date of the proposed
Assignment, and all insurance requirements are
fulfilled by the proposed Assignee.

(Emphasis in original).

3

Exxon assigned its interest in the Lease to Tosco. Ex. O; Fischer Aff. ¶ 2. As part of that assignment, Tosco assumed the remaining costs of constructing the gas station and convenience store, which were completed in July 2000. Fischer Aff. ¶ 2. Tosco then merged into plaintiff Phillips Petroleum Company, which later changed its operating name to ConocoPhillips. Fischer Aff. ¶ 2. The service station continued to do business under the Exxon trademark. Ex. 2; Affidavit of Harry Brenner ("Brenner Aff.") ¶ 13.

In a letter dated June 11, 2003, ConocoPhillips informed Rian that it had entered into an agreement to sell a number of service station properties and related leasehold interests, including the Lease, to plaintiff Cumberland Farms, Inc. ("Cumberland Farms"). Ex. G. ConocoPhillips requested that Rian consent to a proposed assignment of the Lease to Cumberland Farms ("Proposed Assignment"). Ex. 4. At some point after receiving the June 11, 2003 letter, Hirshman spoke to "somebody over the phone" at ConocoPhillips and "told them that [he was] not consenting to [the Proposed Assignment]." Hirshman Dep. at 64. On September 10, 2003, ConocoPhillips executed an "Assignment and Assumption Lease" with Cumberland Farms ("Assignment"), in which ConocoPhillips assigned its interest in the Lease to Cumberland Farms. Ex. L. Although the Assignment states that "Landlord has consented to such transfer pursuant to Article 27 of the Lease, a

copy of which consent is attached as Exhibit B attached hereto," no consent form was attached to the document. Id.

In a letter dated September 16, 2003, ConocoPhillips informed Rian that because it did not "respond[] timely to our requests for consent, we take the position that consent has been unreasonably withheld and are, therefore, proceeding with our proposed assignment of the lease to [Cumberland Farms]." Ex. K. ConocoPhillips added that "[u]pon completion of our transaction, we will provide you with a copy of the fully executed assignment of lease for your file, along with information concerning the new tenant." Id.

On November 17, 2003, Rian sent a letter to Cumberland Farms stating that "[w]e indicated to ConocoPhillips that our client would object to your Assignment unless the [pending] defaults were cured." Ex. 6. Rian also stated that it "did not consent to the assignment or assumption of the Lease." Id. Rian explained that its "withholding of consent was based upon (i) [three] pending uncured defaults[5] and (ii) the Landlord's right to object to any assignment to other than a 'Major' [oil company] as defined in [Article 27 of] the Lease." Id. Finally,

_____

[5] Specifically, defendant pointed to the following alleged defaults: (1) unpaid tax arrears in the amount of $528.50; (2) failure of the tenant to furnish a Certificate of Occupancy; and (3) the tenant's failure to qualify for the "ICIP" (discussed infra) and refusal to compensate defendant for the loss of this preferred tax status. Ex. 6.

defendant stated that "[a]ll rents paid or received since the date of your purported Assignment from ConocoPhillips will be accepted by the Landlord <u>without prejudice to the Landlord's rights and remedies, all of which are fully reserved." Id.</u> (emphasis in original). From September 30, 2003 onward, Cumberland Farms paid rent directly to Rian.[6] Affidavit of Christine Corkum ("Corkum Aff.") ¶ 3.

In a document entitled "Notice to Cure" and dated August 10, 2004 ("August 10 Notice to Cure"), defendant informed Cumberland Farms that it was in default of various provisions of the Lease. Ex. 9. Article 30 provides a cure period to allow the lessee to cure potential defaults.[7] In the August 10 Notice to Cure,

---

[6] Rian alleges, without any citation to the record, that Hirshman wrote "without prejudice" on the back of the rent checks it accepted from Cumberland Farms. Def.'s Jan. 26, 2006 Mem. at 5; Def.'s Reply to Pl.'s 56.1 Statement ¶ 10. Hirshman interpreted this to mean that he was accepting payment "without prejudice to any other rights [he] may have had on the lease." Hirshman Dep. at 57. None of these checks were included in the current record. It appears, however, from Hirshman's deposition, that he began signing rent checks "without prejudice" in response to an earlier dispute over the ICIP tax incentive discussed in Article 13(f), and not in response to the Assignment. Id. at 55-57 (stating that Hirshman signed checks from Tosco and ConocoPhillips "without prejudice").

[7] Article 30, entitled, "DEFAULTS BY LESSEE AND TERMINATION," states:

> (a) Anything elsewhere herein contained to the contrary notwithstanding, if Lessee shall fail to pay to Lessor any installment of . . . rent . . . or charges as and when the same shall become due and payable, and such default shall continue for a period of thirty (30) days after Notice to Cure

defendant listed the following alleged defaults:

(1) The Lessee is in default in the performance of Article 13(f) entitled "I.C.I.P." in that the Lessee has never furnished nor filed the materials required to enable the Lessor to receive the tax abatements and exceptions provided by the I.C.I.P. Program and that as a result thereof, the Lessor never received the tax abatements nor exceptions to which it would be entitled under the program.

(2) The present occupant of the premises allegedly, pursuant to the mesne assignments, the last of which allegedly was from PHILLIPS/CONOCO to CUMBERLAND FARMS, has never been validated nor is it effective by reason of the multiple failures to comply with the provisions of Article 27 of the Lease entitled "Assignment by Lessee" including, but not limited to, the following:

(i) There was no request for the Landlord's consent to the alleged Assignment from PHILLIPS/CONOCO to CUMBERLAND FARMS and the Landlord never executed a consent nor made a rejection of the application. By reason thereof, the Assignment is a nullity and void.

(3) In accordance with sub-division (b), the Tenant/Lessee EXXON CORP. and each successor Lessee, is not relieved of liability pursuant to the terms of the Lease by reason of the fact that no Assignee, a major oil company, delivered to the Lessor a full, unconditional Assumption Agreement,

---

such default; or if the Lessee shall be in default of the performance of, or violate any of the other terms, covenants and conditions of this lease on its part to be kept and performed, and such default or violation shall continue for a period of thirty (30) days after Notice to Cure such default, then and in such event, Lessor shall have the right, as to uncured defaults other than non-payment of rent and additional rents, at Lessor's option, to terminate this lease and the term thereof, as well as all the right, title and interest of Lessee hereunder, by giving Lessee five (5) days' notice[.]

whereby it assumed all obligations of the Lessee under the Lease.

(4) That in accordance with subdivision (c), there has been no delivery of any Estoppel Certificate and Assignment and Assumption Agreement (duly acknowledged) signed by all of the parties to such Assignment. To date, same has never been furnished by the occupant, CUMBERLAND FARMS, nor its alleged Assignor.

(5) The documents required to be furnished to the Lessor, in accordance with (4) above, were required pursuant to sub-division (c) to be delivered ". . . prior to the effective date of the proposed Assignment. . . ." Same was not so delivered.

Ex. 9. The "Notice to Cure" advised Cumberland Farms that unless the enumerated defaults were cured within thirty days, the Landlord "may at its option elect to terminate the subject Lease by giving appropriate Notice of Termination." Id.

On September 8, 2004 Cumberland Farms and ConocoPhilips (collectively "plaintiffs") filed suit against Rian in New York State Supreme Court, seeking declaratory and injunctive relief, including a temporary restraining order and a Yellowstone injunction pursuant to First Nat. Stores, Inc. v. Yellowstone Shopping Center, Inc., 21 N.Y.2d 630, 237 N.E.2d 868, 290 N.Y.S.2d 721 (1968).[8] Ex. A. On September 9, 2004, the court

---

[8] "The purpose of a Yellowstone injunction is to stay the cure period before it expires so as to preserve the lease until the merits of the dispute can be resolved in court, and neither nullifies the remedies to which a landlord is otherwise entitled nor rewrites the lease." Reade v. 405 Lexington, L.L.C., 19 A.D.3d 179, 180, 798 N.Y.S.2d 393, 394 (1st Dep't 2005) (citing Graubard Mollen Horowitz Pomeranz & Shapiro v 600 Third Ave. Assoc., 93 N.Y.2d 508, 514-515, 715 N.E.2d 117, 120, 693 N.Y.S.2d

granted plaintiffs' request for a temporary restraining order.
Ex. D.  On September 15, 2004, defendant removed the case to
federal court based on diversity jurisdiction.  On September 28,
2004, Rian filed an answer and counterclaim.[9]  Ex. B.  After
defendant filed an "Affirmation of Consent" to the <u>Yellowstone</u>
injunction, an order was entered on November 30, 2004, granting
the <u>Yellowstone</u> injunction and tolling the cure period, "such
that plaintiffs shall have at least twenty (20) days after
service upon it of a copy of the order to be entered determining
this action, to cure, or to commence to cure and thereafter to
proceed diligently to cure, any default as may be found by this
court."  Ex. D.

On November 23, 2005, Rian filed a motion for summary
judgment seeking a termination of the Lease and attorneys' fees
under Article 40 of the Lease.[10]  On December 27, 2005,
plaintiffs filed a cross-motion for summary judgment seeking a
declaratory judgment that the assignment is valid and the lease
is entitled to full force and effect.

---

91, 94-95 (1999)).

[9]  Defendant's counterclaims seek to limit the cure period
to four days after a judgment by the court and to recover
attorneys' fees under Article 40 of the Lease.  Ex. B.

[10]  Although Rian's motion is entitled "Memorandum of Law
for Rule 56 Motion to Dismiss," it is clearly a motion for
summary judgment.

## The Alleged Defaults

### a.  Failure to qualify for tax incentive program

Under Article 13, the Lessee is required pay, as "additional rent," 50% of the real estate taxes for the Premises. Additionally, Article 13(f) of the Lease requires the Lessee to cooperate with the Lessor in filing the forms required to receive certain tax incentives and abatements for new construction under New York City's Industrial and Commercial Incentive Program ("ICIP").[11]  To qualify for an ICIP tax abatement, an applicant

---

[11]  Article 13(f) of the Lease states:

I.C.I.P:  Lessee has been made aware of the fact that The City of New York offers tax incentives and abatements for new construction and alterations to properties within certain areas of The City of New York (for which the [Premises] is eligible).  It is, accordingly, agreed that the Lessee shall cooperate with the Lessor in the filing of an [ICIP] proceeding (Preliminary and Final Applications), for tax abatements and exemptions by reason of the Lessee's required alterations and improvements to the Premises.  It is agreed that in furtherance of this provision, the Lessee shall furnish to the Lessor, prior to the Lessee's submission of plans to appropriate Building Departments and prior to the Lessee's pulling its permits for the construction, copies of the Lessee's proposed plans and specifications, together with cost estimates of the proposed improvements . . . .  The Lessee shall inform the Lessor of the date of the filing of its plans, of the date that it intends to "pull" available permits and of the date of its contemplated commencement of construction.  These dates are critical because the ICIP Program mandates certain filings within specified periods of each of the

must file both a preliminary application and a final application. DiGirolamo Dep. at 11. Vassalotti Associates ("Vassalotti"), an architectural firm, was retained to complete the preliminary ICIP application. Id. at 15. Although it is unclear whether Exxon or Rian hired Vassalotti, it appears likely that Exxon retained the firm. On September 18, 1998, Vassalotti submitted the preliminary ICIP application to the New York City Finance Department. Ex. M. On October 5, 1998, Vassalotti sent a letter to Hirshman, informing him that the preliminary ICIP application had been filed. The October 5th letter contained instructions for filing the final ICIP application. Id. The letter also stated "[p]lease be advised we have not been retained to complete the final application." Id. According to Vassalotti's engineer, he never had any further discussion with Exxon about submitting the final ICIP application. DiGirolamo Dep. at 15. In its February 27, 2000 letter to Rian, Exxon discussed the pending ICIP application, stating:

───────────────

> afore-described events. Accordingly, the Lessee understands and acknowledges that its failure to notify the Lessor of the events above described may result in the disqualification of the project from the ICIP program. A copy of the ICIP Application (for information purposes only) is annexed hereto as EXHIBIT D. It is understood and agreed that the Lessee's cooperation with the Lessor's filing of the ICIP Application shall be deemed a covenant and requirement of the Lessee under this Lease.

(Emphasis in original).

> Attached are copies of the preliminary application
> for the [Premises] and correspondence to Mr.
> Hirshman concerning the final application.  As
> indicated by these papers, ExxonMobil had
> cooperated with Mr. Hirshman and has complied with
> its obligations under Article 13(f) of the lease:
> ExxonMobil provided plans and supporting
> documentation to Mr. Hirshman, timely filed and
> obtained regulatory acknowledgment of the
> preliminary ICIP application, and delivered copies
> of the relevant documents to Mr. Hirshman,
> including the date of projected commencement of
> construction (i.e., January 1, 1999).

Ex. O.

It appears that the final ICIP application was never filed.
As such, the Premises never qualified for the ICIP tax
abatements.  In a letter dated May 27, 2003, defendant informed
ConocoPhillips that its contribution toward the taxes for the
Premises would be increased because "[a]s you are aware, Exxon
failed to comply with the Lease requirement for the filing of
documentation necessary for the qualification of [the Premises]
under the [ICIP]."[12]  Ex. 5.  According to Rian, if the property
had qualified for the ICIP tax abatements the taxes for a
specific portion of the Premises "would have been frozen at their
pre-construction levels (save for rate increases) of $11,741.42
per half year."  Id.  However, because the property did not
qualify, real estate taxes increased to $23,404.83 per half year.

---

[12]  In the May 27, 2003 letter, defendant also demanded that
ConocoPhillips furnish a new Certificate of Occupancy.  Id.  In
addition, defendant demanded that ConocoPhillips pay outstanding
Illuminated Sign and Fire Prevention Certificate charges and also
furnish certain insurance certificates.  Id.

According to the letter, "[a]s a result of the default, Tenant has [admitted its] responsibility for 100% of the increase beyond the [original tax rate]." Id. The letter stated that ConocoPhillips was responsible for $11,663.41, which, according to Rian's calculations, was 100% of the tax increase attributable to the failure to qualify for the ICIP abatements. The letter also stated:

> Because this discrepancy will persist throughout the term of the Lease, it is urged that those persons responsible for issuing tax reimbursement checks for the Tenant to Landlord be apprized [sic] of these calculations.
>
> The Landlord reserves its rights and remedies by reason of this default of the Tenant in regard to the failure of the Tenant to qualify the Premises for ICIP exemptions.

Id.

According to Hirshman, "Tosco took responsibility of paying . . . the difference between the old tax and new tax because they understood that they failed – they failed to apply for the ICIP." Hirshman Dep. at 53. According to Hirshman, Tosco proceeded to pay for "a hundred percent" of the increased tax stemming from the new construction even though under the Lease the lessee was only responsible for 50% of the tax bill for the Premises. Id. at 53. According to Hirshman, he informed Tosco of the increased taxes and "explained [Tosco's] responsibility [for] the increase." Id. at 55. After Tosco's merger into ConocoPhillips, ConocoPhillips, according to Hirshman, continued to pay the

increased taxes.  Id. at 56.  According to Hirshman, once
ConocoPhillips assigned the Lease to Cumberland Farms, Cumberland
Farms refused to pay the increased taxes.  Id.  It appears that
this refusal was what led to Rian serving the August 10 Notice to
Cure.  Id.  It should be noted that according to Vassalotti's
engineer, Exxon "felt that they weren't obligated to [file the
ICIP application] in their lease" and that they only had to
"cooperate with the landlord."  DiGirolamo Dep. at 15.


**b.  Failure to provide documents related to the Assignment**

     The August 10 Notice to Cure alleges that ConocoPhillips
failed to provide defendant, within the time period specified by
the lease, with a number of documents related to the Assignment
to Cumberland Farms.  Plaintiffs concede that an Estoppel
Certificate ("EC") was not delivered to Rian prior to the August
10 Notice to Cure.  Pl.'s 56.1 Statement ¶ 36.  Plaintiffs
eventually procured an EC dated October 26, 2005, Ex. H, which
defendant acknowledges receiving, Def.'s Reply to Pl.'s 56.1
Statement ¶ 15.  It is unclear if a copy of the "Assignment and
Assumption Agreement" was delivered to defendant prior to the
August 10 Notice to Cure.  Pl.'s Mem. of Law at 16 n.4.
Defendant, however, acknowledges that it received the Assignment
and Assumption Agreement after serving the August 10 Notice to
Cure.  Def.'s Reply to Pl.'s 56.1 Statement ¶ 14.  Finally, it

must be noted that plaintiffs do not dispute Rian's assertion in paragraph "(3)" of the August 10 Notice to Cure that both ConocoPhillips and Exxon remain liable after their respective assignments of the Lease.  Plaintiff's 56.1 Statement ¶¶ 12-13.

## Discussion

### (1)

### Jurisdiction

Diversity jurisdiction exists over this controversy pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1441(b), as the parties are citizens of different states and the amount in controversy exceeds $75,000.  Under 28 U.S.C.A. § 1441(b), removal is not permitted if the "defendant[] is a citizen of the State in which such action is brought."  If the plaintiff, however, fails to object within thirty days of removal, this procedural defect is waived.  Handelsman v. Bedford Village Associates Ltd. Partnership, 213 F.3d 48, 50 n. 2. (2d Cir. 2000); Woodward v. D. H. Overmyer Co., 428 F.2d 880, 882-83 (2d Cir. 1970).  Because plaintiffs have never argued that removal was improper, jurisdiction lies.

### (2)

### Applicable Law

Article 38(a) of the Lease contains a choice of law clause,

which states that "[t]he parties agree that this lease shall be construed in accordance with the Laws of the State of New York," and none of the parties contend that the choice of law clause is, in any way, improper.


## (3)

### Summary Judgment and Contract Interpretation

"Whether or not a writing is ambiguous is a question of law to be resolved by the courts." W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990) (citing Van Wagner Adv. Corp. v. S & M Enters., 67 N.Y.2d 186, 191, 492 N.E.2d 756, 758, 501 N.Y.S.2d 628, 631 (1986); see also Yanuck v. Paston & Sons Agency, 209 A.D.2d 207, 208, 618 N.Y.S.2d 295, 296 (1st Dep't 1994) (when determining a motion for summary judgment based upon a written contract, "the construction of an unambiguous contract is for the court to pass on, and circumstances extrinsic to the agreement or varying interpretations of the contract provisions will not be considered when the intention of the parties can be gathered from the instrument itself."). A contract is not ambiguous when the contract language has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Breed v. Ins. Co. of North

America, 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 1282, 413 N.Y.S.2d 352, 355 (1978) (noting that "a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed").

"Ambiguity is determined by looking within the four corners of the document, not to outside sources." Kass v. Kass, 91 N.Y.2d 554, 566-67, 696 N.E.2d 174, 180-81, 673 N.Y.S.2d 350, 356-57 (1998). As the Court of Appeals noted in Kass,

> [i]n deciding whether an agreement is ambiguous courts, "should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought."

Id. at 554, 696 N.E.2d at 180-81, 673 N.Y.S.2d at 356-57 (citing Atwater & Co. v. Panama R. R. Co., 246 N.Y. 519, 524, 159 N.E. 418, 419 (1927)). Furthermore, "[w]here the document makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the [agreement]." Id. at 567, 696 N.E.2d at 181, 673 N.Y.S.2d at 357 (quoting Williams Press v. State of New York, 37 N.Y.2d 434, 440, 335 N.E.2d 299, 302, 373 N.Y.S.2d 72, 77 (1975) (internal marks omitted).

Summary judgment, however, is inappropriate where the

"interpretation of contract terms or provisions is susceptible to at least two reasonable interpretations, and intent must be gleaned from disputed evidence or from inferences outside the written words." Yanuck, 209 A.D.2d at 208, 618 N.Y.S.2d 295 at 296 (citing Amusement Bus. Underwriters v. American Int'l Group, 66 N.Y.2d 878, 880-81, 489 N.E.2d 729, 732, 498 N.Y.S.2d 760, 763 (1985); see also Weiner v. Anesthesia Assocs. of Western Suffolk, P.C., 203 A.D.2d 454, 455, 610 N.Y.S.2d 606, 608 (2d Dep't 1994) (noting that where "the terms of the agreement are ambiguous and the intent of the parties becomes a matter of inquiry, parol evidence is permitted to determine that intent").

## (4)

### Rian did not concede that the Assignment to Cumberland Farms was valid.

Plaintiffs argue that because Rian served the August 10 Notice to Cure on Cumberland Farms, but not on ConocoPhillips, Rian acknowledged that the Assignment was valid and effective. Rian made no such concession. The August 10 Notice to Cure stresses that Rian believes that the Assignment was invalid. As such, it cannot be said that Rian conceded the validity of the Assignment by serving the Notice to Cure on Cumberland Farms, the current occupant of the Premises.

### The Notice to Cure was not defective.

Plaintiffs also argue that Rian's failure to serve the August 10 Notice to Cure on ConocoPhillips is a "fatal defect" that renders the August 10 Notice to Cure null and void.[13] That argument is not persuasive. First, Article 30 of the Lease, which discusses defaults and explains the cure period, does not specify which parties must be served with a Notice to Cure in the event of a disputed assignment. Thus, nothing in the Lease compels a finding that the August 10 Notice to Cure is invalid. Second, the procedural history of this case makes clear that ConocoPhillips, who instituted suit on September 8, 2004, immediately became aware of the Notice to Cure. Third, and most importantly, the November 20, 2004 order, which extended the cure period, gave ConocoPhillips ample opportunity to cure any defaults alleged in the August 10 Notice to Cure, negating any possibility that ConocoPhillips was prejudiced when the August 10 Notice to Cure was only served on Cumberland Farms.

Plaintiffs' reliance on Stephen Estates, Inc. v. Kaplan, 198 Misc. 948, 100 N.Y.S.2d 455 (N.Y.C. Mun. Ct. Bronx County 1950) is misplaced. In Stephen Estates, the landlord brought a summary

---

[13] Defendant contends that the Notice to Cure was in fact served on Tosco. Def.'s Reply to Pl.'s 56.1 Statement ¶ 14. Defendant, however, cites to no record evidence to support that assertion. Notably, the Notice to Cure was only addressed to Cumberland Farms.

holdover proceeding against a residential occupant-assignee based on a lease provision that barred assignment. The court dismissed the action because the landlord failed, as required by regulation, to serve a written notice to cure on the tenant-assignor. In reaching its decision, the court noted that "[a] summary proceeding is a special proceeding governed entirely by statute. There must be strict compliance with these statutory requirements to give the Court jurisdiction." Id. at 955, 100 N.Y.S.2d at 463. The instant action does not a involve a summary proceeding. To the extent that certain unique protections, particularly the requirement that residential landlords strictly follow specific notice standards, are afforded in such proceedings, they are inapplicable in the instant commercial lease dispute.[14] See 200 West 58th St. LLC v. Little Egypt Corp., 7 Misc.3d 1017(A), 801 N.Y.S.2d 243 (N.Y. Civil Ct. N.Y. County 2005) (table case) (noting in commercial holdover proceeding that the "requirements for a sufficient notice to cure vary with the facts of a case and applicable statutory grounds

_____

[14] Plaintiffs also cite to Prospect Int'l (NY) Corp. v. Cavallaro, N.Y.L.J., July 9, 1996, p. 29 col. 6 (App. Term 2d Dep't), and Conti v. Carino, N.Y.L.J., Oct. 28, 1992, p. 21 (Civ. Ct. Kings Co.), which were only published in the New York Law Journal. Plaintiffs have failed to provide copies of these cases, which are not available on Westlaw or LexisNexis. Furthermore, even accepting plaintiffs' characterizations of these cases, they are inapposite as they concern a landlord's failure, in the context of summary proceedings, to join or properly serve a notice to residential tenant-assignors.

for eviction.").  Furthermore, although improper notice can affect the jurisdiction of the court in a summary proceeding brought against a tenant, there is no question that jurisdiction exists over ConocoPhillips, who brought this action as co-plaintiff.  See Hughes v. Lenox Hill Hosp., 226 A.D.2d 4, 651 N.Y.S.2d 418 (1st Dep't 1996) (noting that notice requirements of summary proceedings were not applicable when occupant-plaintiff, and not landlord, brought declaratory judgment action), leave to appeal denied, 90 N.Y.2d 829, 683 N.E.2d 17, 660 N.Y.S.2d 552 (1997).

**(6)**

**Rian did not waive its rights under the Lease by accepting rent from Cumberland Farms.**

Plaintiffs argue that defendant waived any claim that the Assignment constituted a breach of the Lease because defendant accepted rent payment from Cumberland Farms since the Assignment in September 2003.  Plaintiffs also note that defendant has continued to accept rent from Cumberland Farms since serving the August 10 Notice to Cure.

Article 32, entitled "NON-WAIVER OF RIGHTS," states:

> Unless the lease has been amended in writing, any default by Lessor or Lessee, or any failure of Lessor or Lessee to enforce the provisions of this lease upon any default by the other, shall not be construed as creating a custom of deferring payment or as modifying in any way the terms of this lease or as a waiver of the right to terminate this lease

<u>or to enforce the provisions hereof for that or any
other subsequent default</u>.

(Emphasis added).  In addition to this no-waiver provision,
defendant's November 17, 2003 letter to Cumberland Farms objected
to the Assignment because it was not to a "Major" oil company and
that all rents paid after the Assignment "will be accepted by the
Landlord <u>without prejudice to the Landlord's rights and remedies,
all of which are fully reserved</u>, Ex. 6 (emphasis in original).
Moreover, defendant asserts that Hirshman signed all of the rent
checks "[a]ccepted without prejudice," Hirshman Dep. at 57.[15]

Although acceptance of rent with knowledge of a default can
constitute a waiver of a landlord's rights, no waiver occurred
here based on defendant's November 17, 2003 letter and the no-
waiver provision in the Lease.

"A waiver is the voluntary abandonment or relinquishment of
a known right.  It is essentially a matter of intent which must
be proved."  <u>Jefpaul Garage Corp. v. Presbyterian Hosp.</u>, 61
N.Y.2d 442, 446, 462 N.E.2d 1176, 1177, 474 N.Y.S.2d 458, 459
(1984).  It is a "settled principle that acceptance of rent by a
landlord from a tenant with knowledge of the tenant's violation
of the terms of the lease normally results in a waiver of the

---

[15]  As noted <u>supra</u> n.6, it appears that Hirshman was signing
the checks "without prejudice" prior to the Assignment based on
his belief that Exxon and ConocoPhillips defaulted under Article
13(f) by failing to file the final ICIP application.  Hirshman
Dep. at 56-57.

violation." Id. at 447, 462 N.E.2d at 1178, 474 N.Y.S.2d at 462

(citing Woollard v. Schaffer Stores Co., 272 N.Y. 304, 312, 5

N.E.2d 829, 832 (1936); Murray v. Harway, 56 N.Y. 337 (1874)).

In Jefpaul, the Court of Appeals explained that

> [t]he logic underlying this rule is plain enough:
> the option rests with the landlord to recognize the
> violation and terminate the tenancy.  If he chooses
> to ignore it and accepts rent with knowledge of the
> tenant's violation then the acceptance evidences
> his waiver and an election to continue the
> relationship.  Although the intent to waive is
> usually a question of fact, knowing acceptance of
> rent without any effort to terminate justifies an
> inference that the landlord has elected to hold the
> tenant to the lease. The primary reason for the
> rule is the inconsistency of the landlord's
> positions.  As one old English case put it, the
> landlord should not be permitted "to treat a man as
> a tenant, and then treat him as a trespasser."
> Undoubtedly, however, the courts have applied the
> rule also to prevent a forfeiture of the tenant's
> estate.

Id. at 447-48, 462 N.E.2d at 1178-79, 474 N.Y.S.2d at 460-61

(citation omitted).

Courts have applied this rule even in cases where the lease

contains a general no-waiver provision.  TSS-Seedman's, Inc. v.

Elota Realty Co., 72 N.Y.2d 1024, 531 N.E.2d 646, 534 N.Y.S.2d

925 (1988) (declining, without explanation, to find non-waiver

clauses applicable in commercial lease dispute where tenant

remedied all rent delinquencies prior to landlord's service of

termination notices).  Courts have often applied this rule in

disputes where the landlord accepted rent for years before

raising any issue of default.  P&D Cards and Gifts, Inc. v.

23

Matejka, 150 A.D.2d 660, 662, 541 N.Y.S.2d 533 (2d Dep't 1989) (finding waiver where commercial landlord had accepted rent for over forty months before attempting to terminate lease and lease's no-waiver clause did not specifically refer to acceptance of rent); 201 East 37 Owners Corp. v. Cass, 3 Misc.3d 1102(A), 787 N.Y.S.2d 682 (N.Y. Civ. Ct. N.Y. County 2004) (table case) (finding waiver where landlord accepted rent from residential occupant, who was in open possession of the premises for over eleven years); see also In re City Stores Company, 42 B.R. 685, 693 (S.D.N.Y. 1984) (noting that New York cases finding that landlord waived a restrictive covenant often involve "equitable grounds, such as the passage of time or a substantial investment by the tenant following the landlord's implicit consent").

When faced with commercial leases containing specific no-waiver clauses, courts have, however, refused to find waiver. See La Lanterna, Inc. v. Fareri Enters., Inc., 37 A.D.3d 420, 831 N.Y.S.2d 190, 192 (2d Dep't Feb. 6, 2007) (refusing to find waiver based on landlord's acceptance of rent with knowledge of default where commercial lease "specifically provided that acceptance of rent despite knowledge of a breach did not constitute a waiver of that breach, unless there was a written waiver"); Excel Graphics Techs., Inc. v. CFG/AGSCB 75 Ninth Ave., L.L.C., 1 A.D.3d 65, 69, 767 N.Y.S.2d 99 (1st Dep't 2003) (holding that landlord did not, by accepting rent from subletter

24

and listing subletter in building directory, waive requirement
that commercial tenant seek prior written consent before
subletting where lease required that waivers be in writing and
contained non-waiver clauses concerning both acceptance of rent
and listing of tenants in the building directory), appeal
dismissed, 2 N.Y.3d 794, 814 N.E.2d 464, 781 N.Y.S.2d 292 (2004).
In contrast, courts often find waiver in residential cases where
the lease contains a specific no-waiver clause; Sagson v. Weiss,
83 Misc.2d 806, 807, 474 N.Y.S.2d 88 (Sup. Ct. App. T. 1st Dep't
1975) (per curiam) (holding that clause in residential lease
stating that no waiver would occur if landlord accepted rent with
knowledge of breach was inapplicable to "a claim of waiver by
open possession"); 215 W. 34th St. v. Feldman, 105 N.Y.S.2d 209
(Sup. Ct. App. T. 1st Dep't 1951) (finding no-waiver provision
concerning rent collections inapplicable in residential lease
dispute where there was "open and notorious possession . . . for
long periods of time").

Even when a lease does not contain a specific no-waiver
provision, courts have sometimes refused to find waiver where the
landlord informed the tenant that it would accept rent without
prejudice to the landlord's rights under the lease. See 200
Eighth Ave. Rest. Corp. v. Daytona Holding Corp., 2001 N.Y. Slip
Op. 50023(U), 2001 WL 1602653 (Sup. Ct. N.Y. County Oct. 3, 2001)
(unpublished) (holding that, where correspondence between the

parties made it clear that landlord was accepting the rent without prejudice while assignment application was pending, such acceptance did not "signify acceptance of the assignment"); 18th Ave. Pharmacy v. Wilmant Realty Corp., 95 N.Y.S.2d 534, 537 (Sup. Ct. Kings County Spec. T. 1950) (holding that landlord did not waive commercial tenant's breach of the lease where landlord initially refused subletter's rent, objected to sublet and only accepted rent after the parties agreed that rent "was accepted without prejudice to either party"). Contra Woollard v. Schaffer Stores Co., Inc., 272 N.Y. 304, 5 N.E.2d 829 (1936) (finding waiver based on acceptance of rent in commercial setting where lease did not contain no-waiver provision, landlord informed tenant that rents would be accepted without prejudice, but tenant explicitly responded that payments would be "made as usual . . . without strings or exceptions" and landlord indorsed some, but not all, checks "subject to litigation pending").

Although the Lease does not contain a no-waiver clause specifically addressing the situation where the landlord accepts rent with knowledge of a default, the Lease's general no-waiver clause combined with defendant's November 17, 2003 letter, which informed Cumberland Farms that it would accept rent "without prejudice," compel a finding that no waiver occurred in this case. Not only is this a commercial lease, but, when compared with other cases, the time period (ten months) between

26

defendant's initial objection in November 2003 and the Notice to Cure in September 2004 was relatively short. Furthermore, unlike the tenant in <u>Woollard</u>, 272 N.Y. 304, 5 N.E.2d 829, Cumberland Farms did not, in any manner, object to Rian's condition that it would accept rent "without prejudice." Finally, it must be stressed that the lease at issue in <u>Woollard</u> did not contain a no-waiver clause.[16] Accordingly, Rian did not waive its rights when it accepted rent from Cumberland Farms.

## (7)

**Exxon and subsequent lessees did not default under Article 13(f).**

In the August 10 Notice to Cure, defendant maintained that "the Lessee has never furnished nor filed the materials required to enable the Lessor to receive the tax abatements and exceptions provided by the I.C.I.P. program." Defendant does not press this issue in either of the briefs it submitted. The following

---

[16] Plaintiff's reliance on two additional cases is misplaced. In <u>Condit v. Manischewitz</u>, 220 A.D. 366, 221 N.Y.S. 371 (1st Dep't 1927), the landlord accepted rent, with knowledge of default, from the tenants for over eight years. Furthermore, the no-waiver provision in the lease only stated that a failure by the landlord to insist on strict performance of the lease in one instance of default would not prejudice the landlord's right to demand <u>future</u> performance of all covenants in the lease. In <u>Schwartz v. Certified Mgmt. Corp.</u>, 117 A.D.2d 521, 522-23, 498 N.Y.S.2d 135, 136-37 (1st Dep't 1986), the residential lease at issue did not contain a no-waiver provision and the landlord did not object to defaults during the ten month period prior to the action for recovery of premises.

excerpt from defendant's Reply to Plaintiff's Rule 56.1 Statement

is the only mention of any default under Article 13(f).

> It is Defendant's position that EXXON orally and by
> conduct undertook to obtain the I.C.I.P. tax
> abatement and further, that said obligation was
> confirmed by the fact that EXXON and subsequently
> TOSCO both made payment of pro rata tax increases,
> including what would not have been payable if the
> I.C.I.P tax abatement had been obtained.  It is
> Defendant's position that they made those
> additional payments because they were aware that it
> was their responsibility which they undertook and
> that they failed to perform.

Def's Reply to Pl.'s Rule 56.1 Statement ¶ 1.

Defendant appears to argue that Exxon was required under

Article 13(f) to obtain the ICIP tax abatement and that Exxon

failed to do so.  The language of Article 13(f), however, only

requires that the lessee cooperate with the lessor's filing of

the ICIP application.  Specifically, Article 13(f) states that

"the Lessee shall cooperate with the Lessor in the filing of an

[ICIP] proceeding (Preliminary and Final Applications)" and that

"the Lessee's cooperation with the Lessor's filing of the ICIP

Application shall be deemed a covenant and requirement of the

Lessee under this Lease."  (Emphasis added).  The terms

"cooperate" and "cooperation" cannot be read to place upon the

lessee the responsibility for the filing of the ICIP application.

Furthermore, the phrase "the Lessor's filing of the ICIP

application" makes it clear that the ultimate responsibility for

filing the application was placed on the defendant.  In arguing

28

that Exxon was responsible for filing the ICIP application,

defendant ignores the language of Article 13(f) and focuses on

the acts of Exxon, notably Exxon's retainer of Vassalotti, which

filed the preliminary application.  Courts, however, will only

consider the practical construction placed on a contract by the

parties when the contract is ambiguous.  See Estate of Hatch v.

NYCO Minerals, Inc., 245 A.D.2d 746, 749, 666 N.Y.S.2d 296, 299

(3d Dep't 1997) (refusing to apply the doctrine of practical

construction where the language of the agreements was "definite

and unambiguous").  The language of Article 13(f) is clear in

assigning ultimate responsibility for the filing of the ICIP

application on the lessor; as such, there is no need to resort to

any practical construction employed by the parties.[17]  Because

Exxon was not responsible for filing the ICIP application and

defendant has failed to show that Exxon, in any manner, failed to

---

[17]  It is strange that Rian has not focused its argument on
Cumberland Farms' failure to pay the increased taxes related to
the failure to qualify for the ICIP.  Both Exxon and
ConocoPhillips appear to have paid the increased taxes, and
Cumberland Farms' failure to follow suit was, according to
Hirshman, the impetus for the current litigation.  Rian has not,
however, asserted (in either the August 10 Notice to Cure or any
of their papers) that Cumberland Farms' failure to pay the
increased taxes was a breach of the Lease as written, or
potentially, as later modified.  Furthermore, even though the
language in the Lease clearly placed the responsibility for
filing the ICIP on Rian, Rian could have potentially asserted a
claim of equitable estoppel based on Rian's allegation that Exxon
undertook the responsibility for filing the ICIP.  However, as no
such claims were raised by defendant, those issues will not be
considered.

cooperate with Lessor's attempts to file the application, no
default occurred under Article 13(f).

**(8)**

**Plaintiffs were not required to seek declaratory relief prior to
the Assignment.**

Defendant argues that ConocoPhillips was barred from making
the Assignment without first seeking a judicial determination
that defendant's consent was unreasonably withheld.  According to
defendant, "[w]hether or not [defendant] was justified in
withholding its consent is irrelevant."  Def.'s Nov. 23, 2005
Mem. at 16.  Defendant fails to point to a single authority to
support this position.

New York courts have not questioned the ability of a lessee
to assign a lease or sublet a premises when the landlord
unreasonably refuses to consent under a lease specifying that
consent may not be unreasonably withheld.  See Shapiro v.
Dwelling Managers, Inc., 92 A.D.2d 52, 57, 459 N.Y.S.2d 579, 582
(1st Dep't 1983) (noting that, independent of any statutory
remedies a residential tenant may have, "if the lease provides
that consent shall not unreasonably be withheld, then . . . the
tenant may sublet if the landlord unreasonably withholds his
consent."); Arlu Assocs., Inc. v. Rosner, 14 A.D.2d 272, 273-274,
220 N.Y.S.2d 288, 290-291 (1st Dep't 1961) (holding that
commercial tenant may pursue damages actions against landlord,

30

who unreasonably withheld consent to assignment, and is not limited, among other remedies, to making assignment without landlord's consent), aff'd without opinion, 12 N.Y.2d 693, 185 N.E.2d 913, 233 N.Y.S.2d 477 (1962); 72nd Street Assocs. v. Pyle, 124 Misc.2d 1087, 1089, 480 N.Y.S.2d 160, 161 (Sup. Ct. App. T. 1st Dep't 1984) (examining residential tenant's claim under statutory law, but noting that "[a]t common law, when a landlord violated a covenant not to withhold consent unreasonably, the tenant could," among other strategies, "proceed to sublet and then defend the landlord's eviction proceeding."), modified on other grounds, 105 A.D.2d 607, 481 N.Y.S.2d 341 (1st Dep't 1984), appeal dismissed, 64 N.Y.2d 774, 475 N.E.2d 457, 485 N.Y.S.2d 991 (1985); Kruger v. Page Mgmt. Co., Inc., 105 Misc.2d 14, 23-24, 432 N.Y.S.2d 295, 302 (Sup. Ct. N.Y. County Spec. T. 1980) (examining residential tenant's claim under statutory law, but noting that "[w]here a landlord has agreed not to withhold consent unreasonably and violates such agreement, the Courts have held that the tenant may ignore the restrictive covenant and sublet the premises"), appeal dismissed, 80 A.D.2d 525 (1st Dep't 1981); Singer Sewing Mach. Co. v. Eastway Plaza, 5 Misc. 2d 509, 510, 158 N.Y.S.2d 647, 648 (Sup. Ct. Monroe County 1957) (holding that commercial tenant could pursue money damages against landlord and rejecting argument that tenant was limited to, among other remedies, the right "to assign without the consent, and

leave the question as to the landlord's reasonableness to a court
for determination, if the landlord seeks to vitiate the
assignment"); Butterick Publ'g Co. v. Fulton & Elm Leasing Co.,
Inc., 132 Misc. 366, 369, 229 N.Y.S. 86 (Sup. Ct. N.Y. County
1928) (granting declaratory judgment in favor of commercial
tenant and noting that "after the refusal of the landlord to give
his written consent, the tenant has a right to sublet or assign
to any person against whom the landlord could have no reasonable
objection, and to make such a sublease or assignment without
obtaining the landlord's consent in writing or otherwise").

Of course, a lessee who elects to assign a lease without
first obtaining an adjudication of the reasonableness of the
landlord's refusal must later defend the assignment in court if
the landlord brings suit and attempts to establish that its
consent was, in fact, reasonably withheld. See Robert F. Dolan,
1 Rasch's N.Y. Landlord and Tenant Incl. Summary Proceedings §
9:95 (2006) (online ed.) (Although a tenant may ignore a
restrictive covenant and assign a lease if consent is
unreasonably withheld, "[t]his course of action is fraught with
danger. The landlord may still assert his rights alleging a
breach of the covenant, and it will then be necessary for the
tenant to prove . . . that consent was unreasonably withheld.").

Although courts questioned, for a time, whether a tenant was
permitted to seek monetary damages when a landlord unreasonably

withheld consent, courts have always assumed that tenants have
the ability to assign or sublet and later defend that action in
court.  In <u>Arlu Assocs.</u>, the court noted that earlier case law,
which had not allowed tenants to pursue money damages for a
landlord's unreasonable refusal to consent, held that a "tenant's
remedy was <u>to disregard the covenant</u> or to seek a declaratory
judgment or specific performance in equity."  14 A.D.2d at 274,
220 N.Y.S.2d at 290 (citing <u>Treolar v. Bigge</u> ([1873], L.R. 9 Ex.
151); <u>Sear v. House Property & Inv. Soc.</u>, ([1880] 16 Ch. D. 387))
(emphasis added).

    Plaintiffs were permitted assign the Lease to Cumberland
Farms if Rian unreasonably withheld consent to the Proposed
Assignment.  Contrary to defendant's assertions, plaintiffs were
not limited to seeking pre-assignment declaratory relief or
damages based on Rian's refusal of consent.

**(9)**

### ConocoPhillips was entitled to assign the Lease under Article 27(a).

  Because defendant unreasonably withheld consent to the Proposed
Assignment under Article 27(a), Conoco Phillips was entitled to
make the Assignment.  Article 27(a) states, in relevant part,
that

> [l]essee shall not assign its interest in this
> lease or in the [Premises], in whole or in part,
> without the prior written consent of Lessor, which

33

> consent shall not be unreasonably withheld. . . .
> Lessor's denial of consent to assignment to a
> proposed assignee which is not a major oil company
> or a company with a net worth of less than
> $100,000.00, shall not be deemed unreasonable,
> unless Lessee agrees to remain liable.

Thus, in order for the lessee to make an assignment under Article 27(a), the lessee must seek the lessor's prior written consent and the assignment must be to either a "major oil company" or to a company with a net worth of $100,000,000.00.[18]

ConocoPhillips sought Rian's consent in its June 11, 2003 letter, which contained an overview of Cumberland Farms' operations. Ex. G. Defendant never responded in writing to the June 11, 2003 letter and appears to have orally refused consent during telephone discussions with ConocoPhillips, Hirshman Dep. at 64. Thus, the question becomes whether defendant's denial of consent was reasonable. Because Cumberland Farms satisfies the net worth threshold set out in Article 27(a), defendant's consent was unreasonably withheld. Defendant argues, contrary to the language of Article 27(a), that its consent was not unreasonably withheld because although Cumberland Farms meets the net worth threshold, it is not a "major oil company." Article 27(a), however, clearly states that "[l]essor's denial of consent to

---

[18] According to defendant, the figure provided in the Lease ($100,000.00) is a typo and the correct number is $100,000,000.00. Plaintiffs do not dispute this point, which is ultimately irrelevant because defendant concedes that "Cumberland Farms, has a net worth well in excess of $100,000,000. Def's Nov. 23, 2005 Mem. at 8.

assignment to a proposed assignment which is not a major oil company <u>or</u> a company with a net worth of $100,000.00, shall not be deemed unreasonable, unless Lessee agrees to remain liable." (Emphasis added).  As such, provided that Cumberland Farms satisfies the net worth threshold, which defendant has conceded, it is irrelevant whether Cumberland Farms is a "major oil company."[19]  Finally, although not raised by plaintiffs, even if Cumberland Farms did not qualify as a "major oil company" or meet the net worth threshold, the Assignment would still appear to be permissible under Article 27(a) because "the Lessor [ConocoPhillips] agree[d] to remain liable" under the Lease.

## (10)

### ConocoPhillips's failure to provide an Estoppel Certificate prior to the Assignment was amenable to cure.

Defendant argues that the Assignment is invalid because plaintiffs failed, as required by Article 27(c) to furnish an EC[20]

---

[19]  ConocoPhillips would have been permitted to assign the Lease without Rian's consent under Article 27(b) if Cumberland Farms qualified as a major oil company.  Because ConocoPhillips was entitled to assign the Lease under Article 27(a), there is no reason to reach the issue of whether an assignment would also have been permitted pursuant to Article 27(b).

[20]  An estoppel certificate is a "signed statement by a party (such as a tenant or mortgagee) certifying for another's benefit that certain facts are correct, as that a lease exists, that there are no defaults, and that rent is paid to a certain date."  Black's Law Dictionary 591 (8th ed. 2004).

prior to the effective date of the Assignment.[21] Plaintiffs
eventually provided defendant with an EC within the cure period
provided by the November 20, 2004 order.[22] According to
defendant, however, plaintiff's failure to tender the EC prior to
the effective date of the Assignment "is a default that cannot be
cured subsequent to the date of the assignment."[23] Def.'s Motion
to Dismiss at 11.

Once ConocoPhillips assigned the Lease on September 10, 2003
without having tendered an EC to defendant, it was, of course, no
longer possible for plaintiffs to produce an EC "prior to the
effective date of the proposed assignment." However, because the
parties provided for a Notice and Cure period in Article 30(a),
it is clear that they intended that potential defaults would be
amenable to be cure. Article 30(a) requires a Notice to Cure be
served if the Lessor wishes to terminate the Lease based on the

----

[21] Article 27(c) states that "[n]o assignment shall be
effective unless Lessor is furnished with an Estoppel Certificate
and Assignment and Assumption Agreement (duly acknowledged),
signed by all parties to such assignment, in form reasonably
acceptable to Lessor, prior to the effective date of the proposed
Assignment[.]"

[22] Defendant also claims that plaintiffs failed to obtain
required Certificates of Occupancy. Def's 56.1 Statement ¶¶
29-34. This issue is irrelevant as the August 10 Notice to Cure
did not discuss any failure to obtain Certificates of Occupancy.

[23] Although defendant focuses its argument on the EC, to
the extent that ConocoPhillips may have failed to provide a copy
of the Assignment and Assumption Agreement to defendant prior to
August 10, 2004, the above discussion of curability would apply
equally to the Assignment and Assumption Agreement.

Lessor violation of "any of the [non rent-related] terms, covenants and conditions of this lease."[24]  Defendant's hyper-technical reading of Article 27(c) fails to consider that provision in context with Article 30(a).

Furthermore, the language used in the August 10 Notice to Cure illustrates defendant's belief that the alleged defaults were, in fact, curable.  The August 10 Notice to Cure states that "you are hereby afforded this OPPORTUNITY TO CURE the following enumerated defaults."  Under the doctrine of practical construction, courts may, when examining an ambiguous contractual term, look to the parties' post-execution acts in order to determine their intent.  Paroff v. Muss, 171 A.D.2d 782, 783, 567 N.Y.S.2d 502, 503 (2d Dep't 1991); see also Town of Pelham v. City of Mount Vernon, 304 N.Y. 15, 23, 105 N.E.2d 604, 608 (1952) (recognizing that practical construction can demonstrate the parties' intent and noting that "[t]here is no surer way to find out what parties meant, than to see what they have done.");

_____

[24]  Article 30(a) states, in relevant part, that:

> [a]nything elsewhere herein contained to the contrary notwithstanding, . . . if the Lessee shall be in default of the performance of, or violate any of the other terms, covenants and conditions of this lease on its part to be kept and performed, and such default or violation shall continue for a period of thirty (30) days after Notice to Cure such default, then . . .  Lessor shall have the right [to terminate the Lease.]

(Final emphasis in original).

37

<u>Estate of Hatch v. NYCO Minerals, Inc.</u>, 245 A.D.2d 746, 749, 666 N.Y.S.2d 296, 299 (3d Dep't 1997) (noting that "only where an ambiguity is present in a contract may the subsequent conduct of the parties be used to indicate their intent); <u>Matter of Moncure v. New York State Dep't of Envtl. Conservation</u>, 218 A.D.2d, 266-67, 639 N.Y.S.2d 859, 862 (3d Dep't 1996) (noting that the "practical construction put upon the lease by its signatories is strong evidence" of their intent).

Moreover, courts applying New York law have been reluctant to find analogous defaults incapable of cure. In <u>200 East 87th St. Assocs. v. MTS, Inc.</u>, the court concluded, after a trial to determine the intent of the parties, that the landlord's failure to secure a temporary certificate of occupancy by a specific deadline was a curable default. 793 F. Supp. 1237, 1248 (S.D.N.Y. 1992), <u>aff'd without opinion</u>, 978 F.2d 706 (2d Cir. 1992). The court relied, <u>inter alia</u>, on the fact that the notice to cure sent by the tenant stated that "you may cure such default within thirty (30) days." <u>Id.</u> at 1249-50. Also relevant is <u>Empire State Bldg. Assocs. v. Trump Empire State Partners</u>, 245 A.D.2d 225, 667 N.Y.S.2d 31 (1st Dep't 1997). In <u>Empire State Bldg. Assocs.</u>, the landlord sent the tenant a notice of default alleging that the tenant had violated the lease by filing false and fraudulent documentation with the Buildings Department. <u>Id.</u> at 226, 667 N.Y.S.2d at 33. When the tenant sought a <u>Yellowstone</u>

injunction, the landlord countered that the alleged default was not curable because the false filing was "a past event that cannot be changed." <u>Id.</u> at 229, 667 N.Y.S.2d at 35. The court rejected defendant's argument, explaining that although a re-submission of the filing with correct information could not "'undo' the filing of purportedly inaccurate information, it is not necessary, in order to cure, that a tenant show that it is able to erase the past, as long as it can show that it is able to bring itself in compliance with the lease without vacating the premises." <u>Id.</u> The court refused to "jump at any opportunity to define as 'incurable' violations that may, as a practical matter, be adequately addressed." <u>Id.</u> Although <u>Empire State Bldg. Assocs.</u> was decided in the context of issuing a <u>Yellowstone</u> injunction,[25] its reasoning appears to reflect the general thrust of New York law.[26]

---

[25] In <u>Herzfeld & Stern v. Ironwood Realty Corp.</u>, 102 A.D.2d 737, 738, 477 N.Y.S.2d 7, 8 (1st Dep't 1984), the court explained that "a tenant [is not] required to prove its ability to cure prior to obtaining a <u>Yellowstone</u> injunction. The proper inquiry is whether a basis exists for believing that the tenant desires to cure and has the ability to do so through any means short of vacating the premises."

[26] Defendant contends that Article 27(c)'s requirement that the EC be delivered prior to assignment was a condition precedent, making it incapable of cure. Defendant fails to cite a single case in support this argument. Because conditions are not favored by courts, "[i]f a provision is so phrased as to make it doubtful whether it is a covenant or a condition, the courts will, as a general rule, construe it to avoid a forfeiture." 74 NY Jur.2d <u>Landlord Tenant</u> § 82 (1999). "Although conditions can be imposed without the use of technical words, they must be

Furthermore, defendant has failed to proffer any evidence,
or advance any argument, explaining why timely delivery of the EC
(or the Assignment and Assumption Agreement) was so critical that
the parties would not have intended such a default to be curable.
Absent such a showing, there is no reason to find that
ConocoPhillips' failure to timely tender the EC was incurable.
Accordingly, because ConocoPhillips subsequently provided an EC
(and Assignment and Assumption Agreement) to defendant,
plaintiffs were not in breach of the Lease.

## (11)

### Defendant's counterclaim

Defendant contends that it is entitled to attorneys' fees
and expenses under Article 40 if the action is determined
favorably to defendant.  Because summary judgment is being
granted in favor of plaintiffs, this issue need not be addressed.
It should, however, be noted that Article 40 only allows for the
recovery of attorneys' fees resulting from a party's breach of
its representation that no brokers were involved in negotiating

_____

clearly expressed as conditions."  Id.  The Lease's ambiguity
concerning which defaults are incurable makes it unlikely that
the parties intended the EC tender deadline to be a condition
precedent.  See 200 East 87th St. Assocs. v. MTS, Inc.,793
F.Supp. 1237, 1248 (S.D.N.Y. 1992) (rejecting argument that
deadline to tender temporary certificate of occupancy was an
incurable condition subsequent, as opposed to a curable covenant,
because "the Lease as a whole [was] ambiguous as to the
inflexibility of the [deadline]").

and consummating the Lease.[27]

## Conclusion

Defendant's motion for summary judgment is denied.

Plaintiffs' motion for summary judgment is granted.  The Clerk of

the Court is directed to enter judgment accordingly and close

this case.

Dated:  Brooklyn, New York
        April 26, 2007

                                SO ORDERED:


                                _____/s/_____
                                David G. Trager
                                United States District Judge

─────────────────

[27]  Article 40, entitled "BROKERAGE," states:

     Lessor and Lessee covenant, warrant, and represent
     that there were no brokers instrumental in
     consummating this lease and that no conversations
     or negotiations were had with any broker concerning
     the renting of the [Premises].  The parties hereto
     agree to indemnify, save, defend and hold the other
     harmless from and against any claims, actions,
     proceedings, judgments, awards, costs and
     reasonable counsel fees relating to, arising from
     or resulting from any breach of this representation
     by the indemnifying party.